[Cite as *Wortham v. Dayton*, 2023-Ohio-1767.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| JORDAN M. WORTHAM | : | |
| | : | |
| Appellant | : | C.A. No. 29578 |
| | : | |
| v. | : | Trial Court Case No. 2021 CV 00546 |
| | : | |
| CITY OF DAYTON, OHIO | : | (Civil Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 26, 2023

. . . . . . . . . . .

DWIGHT D. BRANNON and KEVIN A. BOWMAN, Attorneys for Appellant

THOMAS M. GREEN, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Plaintiff-appellant Jordan M. Wortham appeals from a judgment of the Montgomery County Court of Common Pleas affirming his termination from the City of Dayton Police Department by the Dayton Civil Service Board. For the following reasons, we affirm the judgment of the trial court.

**I.    Facts and Proceedings**

{¶ 2} Wortham was employed by the City of Dayton ("the City") as a police officer beginning on April 15, 2013. On January 30, 2019, while off-duty, Wortham took part in a court-ordered child visitation exchange with his estranged wife and failed to properly secure his one-year-old son in a child safety seat prior to transporting him in a motor vehicle. Wortham's wife called the police and filed a complaint against Wortham with the Dayton Police Department. Dayton Police Officers Scottie Fero and Colin Patterson responded to the complaint, which occurred at a United Dairy Farmers ("UDF") gas station. Wortham was not at the scene when the officers took the report.

{¶ 3} In response to learning of his wife's complaint, on February 6, 2019, Wortham contacted the Dayton Police Department to make a report against his wife also alleging child endangering based on events from January 30, 2019; he also made a complaint involving his wife's refusal to allow visitation on February 6, 2019. Officers Fero and Patterson responded to Wortham's home. Prior to their arrival, Wortham also requested for supervisors to respond. As Officers Fero and Patterson approached the front door of Wortham's residence, they observed Wortham standing in the doorway; he turned toward the inside of the home and shouted "get your ass down here." The statement was recorded on both officers' mobile video recorders ("MVR") and was later included in Officer Fero's supplemental police report.

{¶ 4} Upon entering the home, the only other individual that the officers observed inside the home was Wortham's girlfriend, Clarissa Sampson. Because Wortham had observed that the officers had their MVR cameras activated, he told Sampson to record the interaction as well. During his interaction with the police, Wortham was distraught

and appeared visibly upset. Wortham explained that he wanted to file a report against his wife alleging child endangering. He showed the officers a video-recording on his phone of the UDF surveillance cameras depicting his wife after he returned their son to her while she waited for police to arrive on January 30, 2019.

{¶ 5} Wortham also explained to the officers that he was scheduled for another visitation that day and that his wife intended not to comply. He further requested that the officers accompany him to UDF, where the visitation was scheduled to occur, to document her failure to comply. Officers Fero and Patterson drove to the UDF, followed by Sergeants Joseph Setty and Brian Updyke, who had just arrived at Wortham's home. Wortham's mother was present at the UDF in addition to the officers. Wortham was very upset while at the UDF, and his mother attempted to calm him down.

{¶ 6} Based on these two incidents, on May 1, 2019, Wortham participated in a Professional Standards Bureau ("PSB") interview conducted by Detective Daryl Smith and Sergeant Justin Poe. Prior to the interview, Wortham was provided notice to appear and a *Garrity* warning in accordance with *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). Wortham was represented by counsel during the entirety of his interview. The purpose of the interview was to discuss Wortham's wife's complaint from the January 30, 2019 incident and Wortham's actions during the February 6, 2019 incident. Regarding the February 6, 2019 incident, Wortham denied that he made the statement at the front door and denied that it was his voice on the MVR recordings. Wortham indicated he did not know who made the statement and denied hearing it at the time it occurred. Further, Wortham asserted that he wished to make a complaint against

Officer Fero because his report allegedly contained several lies, including that Wortham had made the statement on the MVR recording.

{¶ 7} Following additional investigation, two charges of violating the Civil Service Rules and Regulations of the City of Dayton were issued against Wortham on July 8, 2019. Wortham was served the following day. Relevant to this appeal, Wortham was charged in count two with conduct unbecoming an employee in the public service and/or violation of any enacted or promulgated statute, ordinance, rule, policy, regulation, or other law. The specification alleged that Wortham had made a false statement during his PSB interview on May 1, 2019, when he denied making the statement "get your ass over here" on February 6, 2019, in violation of the Dayton Police Department Rules of Conduct Rule 8.2. A pre-disciplinary hearing was held before Richard Biehl, the Director and Chief of the Department of Police, on September 4, 2019. Both Wortham and his counsel were present during the hearing and offered evidence on his behalf.

{¶ 8} At that hearing, Wortham again denied that he had made the recorded statement on February 6, 2019. When asked if it was possible that Wortham had made the statement but perhaps did not remember making it, Wortham adamantly denied making the statement, stating that "I didn't say it. I don't talk to [Sampson] that way." Exhibit 17.

{¶ 9} Sampson testified that she was present in Wortham's home on February 6, 2019. Sampson stated that she had observed the officers park about 50 feet away from the house on the street and approach the house. Because it was wintertime, the doors and windows to the home were closed. She asserted that she had not seen or heard

Wortham make the recorded statement.

{¶ 10} Sampson testified that she was familiar with the neighbor in the house to her left and that he had a huge dog. When asked if the neighbor would speak aggressively to the dog, she stated "yes." When asked if the recorded statement that police heard could have been the neighbor speaking aggressively to his dog, she responded "yes."

{¶ 11} Wortham asserted that he had evidence from the video-recording that Sampson took on February 6, 2019 while the officers were inside Wortham's home that would affirmatively show that Wortham did not make the recorded statement. Following the hearing, he provided a copy of the recording to Sergeant Poe. In syncing the MVR recordings to Wortham's recording, Sergeant Poe determined that Wortham's recording did not start until after the statement in question had been made and, therefore, it could not definitively show whether Wortham had made the statement or not.

{¶ 12} Based on Sampson's statements during the hearing that the voice on the MVR could possibly be a neighbor, Sergeant Poe and Detective Smith attempted to interview Wortham's neighbors regarding the February 6, 2019 incident. Sergeant Poe and Detective Smith attempted to contact the neighbor to the left of Wortham's house without success. They attempted to contact the neighbor to the right of Wortham's house and eventually made contact with the homeowner, Sarah Burgess, via telephone. Per Sergeant Poe, Burgess stated that she had a dog that she kept in the garage. Because it was a rescue dog, it was very tentative, and they never yelled at it. Burgess denied that either she or her friend Timothy Brown had yelled at the dog on the date in question.

She further stated that the neighbor to her right (two doors down from Wortham) also had a dog, but it was never a problem, and the people never cussed or yelled at it. Burgess stated that she had moved into her house on January 31, 2019, and the house on the other side of Wortham (the left side) had been vacant at that time.

{¶ 13} Following the hearing, Sergeant Poe was also tasked with investigating whether Sampson's 17-year-old daughter, I.J., had been present during the February 6, 2019 incident. I.J. had previously provided a written statement regarding the incident on January 31, 2019, as she was a passenger in Wortham's vehicle at the time of the child custody exchange. However, she had not provided any statement regarding the February 6, 2019 incident at Wortham's home. Wortham indicated during his PSB interviews that he did not recall if I.J. had been present on February 6, 2019. According to Wortham's statements at the September 4, 2019 pre-disciplinary hearing, he was adamant that I.J. and her dog had been present in his home on February 6, 2019. Although Wortham originally indicated during his May 1, 2019 PSB interview that officers could contact I.J., he later informed them that she was unwilling to speak with officers. Sampson also refused to let officers interview her daughter.

{¶ 14} After reviewing the evidence from the hearing and the follow-up information, Chief Biehl recommended a finding of guilty of both charges and specifications and that Wortham be terminated from employment for count two. The City Manager adopted Biehl's findings, finding Wortham guilty and discharging him from employment effective September 19, 2019.

{¶ 15} Wortham timely appealed regarding the finding of guilt as to count two only

to the Civil Service Board of Dayton, Ohio ("the Board"). A hearing was held on November 11 and 12, 2020. In addition to the above history of events, the additional following relevant information was also provided during the hearing before the Board.

{¶ 16} Officer Fero testified that when the recorded statement was made, he was walking up the sidewalk pathway to Wortham's house and could see Wortham just inside the glass storm door. Officer Fero personally observed and heard Wortham yelling into the house at the time the recorded statement was made. Officer Fero did not recall a lot of other noise going on at the time, and he had no difficulty seeing or hearing Wortham. Officer Patterson likewise testified that he had been walking up toward Wortham's house and could see and hear Wortham when the recorded statement was made. Officer Patterson stated that Wortham had just come to his front door and opened up the storm door; he was standing inside the doorway and yelled back into the home. Officer Patterson did not see any people outside or any dogs running around in the area at the time he heard the statement.

{¶ 17} Sergeant Poe testified that he had reviewed the MVR recordings, and it was definitely a male voice that made the recorded statement at issue. Although Sergeant Poe spoke with Wortham's neighbor Burgess, he was unable to speak with her roommate, Timothy Brown, despite his efforts.

{¶ 18} Dawn Manuel, the division manager with the City of Dayton Department of Human Resources, was involved in Wortham's pre-disciplinary proceedings. According to Manuel, Wortham was acting in his official capacity during his May 1, 2019 PSB interview, and the basis for the charges and specification against Wortham was not that

Wortham had made the recorded statement, but that he had denied making the recorded statement during his PSB interview, and the denial was untruthful.

{¶ 19} Chief Biehl testified that if an officer is found to have lied, it affects the integrity of the officer and is treated as a very serious accusation. Making a false claim is very damaging and impacts a police officer's capacity to testify in court. If an officer is found to be dishonest in an investigation, that has to be affirmatively disclosed to defense counsel if the officer is going to testify in a criminal case. Chief Biehl explained that the Police Department has a burden to provide that information to the county prosecutor and city prosecutor for any case in which the employee would potentially testify if there is a sustained finding of dishonesty, because it is considered exculpatory evidence.

{¶ 20} Chief Biehl acknowledged that Wortham's merely making the recorded statement would not likely have been grounds for termination. Nor was the recorded statement an issue under investigation until Wortham and Sampson insisted that Officer Fero had lied in his police report by attributing that statement to Wortham. Based on the allegations that Officer Fero had lied in a police report, it was necessary for the Police Department to further investigate.

{¶ 21} Chief Biehl testified that he was unaware of any technology capable of performing a voice identification from the recorded statement. He explained that the Federal Bureau of Investigation could potentially have technology to compare a sample from an individual to a recorded statement if the quality of the audio were sufficient, but the Dayton Police Department did not have that kind of technology available. Even if such technology were available, it would be reserved for criminal cases, not for

administrative proceedings.

{¶ 22} Detective Smith testified about his investigation and follow-up investigation regarding this case. As part of the follow-up investigation following Wortham's pre-disciplinary hearing, Smith attempted to contact Wortham's neighbors in September 2019 but was unable to make contact with any of them. Detective Smith recalled that he heard a dog barking at one of the houses and believed it had been at the house to the right of Wortham's.

{¶ 23} Sampson testified that on February 6, 2019, she got home from work around 5:10 p.m., went upstairs, and took a shower. As she was getting out of the shower, Wortham informed her that the police were pulling up and asked her to come downstairs. She responded that she would but needed to put on a shirt first. After she got dressed, she came downstairs just as Officer Patterson entered the home. Officer Fero was already inside the home.

{¶ 24} Sampson testified that I.J. was also present at the time of the February 6, 2019 incident in Wortham's home and was upstairs in her bedroom while police were present. Following the September 17, 2019 Findings and Order of the City Manager and Director of the Department of Police, which imposed Wortham's termination, Sampson provided an email purporting to be from I.J. According to I.J.'s email dated September 24, 2019, she had been present in Wortham's home on February 6, 2019, along with her dog, and she did not hear Wortham make the recorded statement.

{¶ 25} Sampson had not heard the recorded statement at the time it was made; she also had not heard any car doors closing, as recorded on the MVR's. However, she

claimed that if Wortham had made the statement, she would have heard it while she was upstairs.

{¶ 26} After hearing the recorded statement on the MVRs, Sampson denied that Wortham had made the statement and stated that Wortham did not speak to her like that. She testified that the recorded statement "really does sound like if I had to guesstimate, it sounds like our next door neighbor, our former next door neighbor." Nov. 11, 2020 Hrg. Tr. 183. According to Sampson, their neighbor, whom she identified as Burgess's husband, used to yell at his dog and his kids all the time. Sampson claimed that he let his dog and cat loose, and she had to call the police on him a couple of times. They did not get along with him. When she came home on February 6, 2019, she did not see her neighbor or a dog out.

{¶ 27} Wortham testified on his own behalf. According to Wortham, he learned on January 31, 2019, that his wife had made a child endangering complaint against him the previous night. On February 6, 2019, after he learned from his wife that she was not going to bring their child to the court-ordered visitation exchange, Wortham called the Dayton Police Department. Wortham stated that he had been in his living room looking out the window when he saw the officers arrive and park in front of his neighbor's house. He denied standing in front of his storm door or stepping outside at any time prior to the officers' walking up to the house. He stated that, as they walked up the sidewalk, he went to the bottom of the stairs and called up to Sampson. He testified that he had said "hey, Clarissa, they are coming. The police are coming. I called. Could you come down?" Nov. 11, 2020 Hrg. Tr. 217. Once the police got to the door, Wortham opened

the wooden door and then the storm door and let them inside. Although I.J. lived with Wortham, he was unsure if she had been home at that time, and if she was, he did not know where she had been inside the house.

{¶ 28} Wortham wanted the police to document that his wife was not showing up with his son for visitation that day, and he wanted to make a child endangering complaint against his wife for her actions on January 30, 2019. About 12-15 minutes after the police arrived, Wortham drove to the UDF in time for the visitation, and the police followed him there.

{¶ 29} Based on the events that occurred on February 6, 2019, Wortham made several formal complaints regarding the other officers. During his May 1, 2019 PSB interview, he wanted the police report revised because he denied making the recorded statement, in addition to pointing out other alleged false statements. Wortham testified in front of the Board that he still denied making the recorded statement and denied hearing anyone else make the statement.

{¶ 30} Following the hearing, the Board affirmed Wortham's discharge from the police department.

{¶ 31} Wortham filed a timely appeal to the Montgomery County Common Pleas Court pursuant to R.C. 2506.01. After briefing was completed, the trial court filed an order remanding the case to the Board. As relevant here, the trial court ordered the Board to decide two things:

First, the Board is to determine whether the contents of the actual recording

were properly included in the appeal before the Board. Second, if the

recording was not reviewed and considered by the Board, the Board must determine whether its contents or authentication questions alter the Appellee's evidentiary support that is required for the falsification charge.

Order Remanding Case to Civil Service Board (Feb. 14, 2022), p. 2.

**{¶ 32}** In response to the remand, the Board made the following findings:

1. The actual recording which was referenced in the Court's Order was not presented as evidence at the hearing which was conducted by the Board. Therefore, the actual recording was not considered by the Board.

2. The verbal contents of the actual recording were referenced by various witnesses and the attorneys.

3. Independent authentication of the contents of the actual recording was not offered or supplied, making voice identification not possible and subject to dispute.

4. Witnesses testified that Plaintiff/Appellant had made the verbal statement which was part of the Charges and Specifications originally filed.

5. The Board found this testimony to be reliable, probative and sufficient and it formed the basis for the relevant portions of the Board's decision. Therefore, the actual recording was not considered and its weight did not alter the evidentiary support which was the basis for that portion of the falsification charge.

Dayton Civil Service Board's Post-Remand Determination (May 4, 2022), p. 1-2.

**{¶ 33}** Following the remand and post-remand briefing, the trial court affirmed the decision of the Board. The trial court found that the record presented to the Board had supported the Board's findings by a preponderance of substantial, reliable, and probative evidence. It also found that the Board's findings were not unconstitutional, illegal, arbitrary, capricious or unreasonable.

**{¶ 34}** Wortham now appeals, raising the following four assignments of error:

1. The evidence considered by the civil service Board at the hearing below and again before the subsequent trial court was insufficient to sustain the decision to terminate appellant and the trial court's affirmation of the decision was error.

2. The failure of the civil service Board to listen to and consider the taped recording of the alleged statement that formed the basis for the charge of lying against the appellant upon the order and remand of the original trial court was error.

3. Rule of Conduct 8.2 upon which the termination was found by the civil service Board and affirmed by the trial court was unlawful, unreasonable, arbitrary, and unconstitutional in its application to the alleged charge in the termination and in its facial application in any circumstances.

4. The termination of appellant was arbitrary, capricious, and not reasonable under the provisions of rule of conduct 4.1 and was error as

a matter of fact and law on the degree of severity of the alleged violation.

## II.    First Assignment of Error

{¶ 35} In his first assignment of error, Wortham contends that the evidence presented to the Board was insufficient to support a finding that he had violated Rule of Conduct 8.2.    Specifically, Wortham argues that the City failed to prove by a preponderance of evidence that Wortham made a false statement.   We disagree.

### a.  Applicable Law

{¶ 36} Wortham elected to proceed in the Montgomery County Common Pleas Court pursuant to R.C. 2506.01.   Decisions of administrative agencies are directly appealable to a court of common pleas and are governed by R.C. 2506.01 et seq. *Englewood v. Turner*, 168 Ohio App.3d 41, 2006-Ohio-2667, 858 N.E.2d 431, ¶ 17 (2d Dist.).   In an administrative appeal, the common pleas court, acting as an appellate court, "may find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record."   R.C. 2506.04.   Based on its findings, the court will then "affirm, reverse, vacate, or modify the order, adjudication, or decision, or remand the cause to the officer or body appealed from with instructions to enter an order, adjudication, or decision consistent with the findings or opinion of the court."   *Id.*

{¶ 37} "[I]n an administrative appeal pursuant to R.C. Chapter 2506, the common pleas court considers the whole record, including any new or additional evidence admitted under R.C. 2506.03, and determines whether the administrative order is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of

substantial, reliable, and probative evidence." (Citations omitted.) *Durell v. Spring Valley Twp. Bd. of Zoning Appeals*, 2d Dist. Greene No. 2012-CA-23, 2012-Ohio-5098, ¶ 21. "The court weighs the evidence to determine whether a preponderance of reliable, probative, and substantial evidence supports the administrative decision, and if it does, the court may not substitute its judgment for that of the board." *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, ¶ 13, citing *Dudukovich v. Lorain Metro. Hous. Auth.*, 58 Ohio St.2d 202, 207, 389 N.E.2d 1113 (1979). "[A] preponderance of evidence means the greater weight of evidence. * * * The greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium." *Travelers' Ins. Co. v. Gath*, 118 Ohio St. 257, 261, 160 N.E. 710 (1928). " 'In a proceeding pursuant to R.C. 2506, the burden is on the party prosecuting the appeal * * * to demonstrate the error committed by the commission.' " *Baron v. Civ. Serv. Bd. of Dayton*, 2d Dist. Montgomery No. 25273, 2012-Ohio-6179, ¶ 18, quoting *Maple Heights v. Karley*, 8th Dist. Cuyahoga No. 36564, 1977 WL 201604, *4 (Nov. 23, 1977).

{¶ 38} "A party who disagrees with a decision of a court of common pleas in an R.C. Chapter 2506 administrative appeal may appeal that decision to the court of appeals but only on 'questions of law.' " *Shelly Materials, Inc. v. City of Streetsboro Planning & Zoning Comm.*, 158 Ohio St.3d 476, 2019-Ohio-4499, 145 N.E.3d 246, ¶ 17, citing R.C. 2506.04. For this reason, an appeal to the court of appeals is "more limited in scope" than was the appeal to the court of common pleas. *Kisil v. Sandusky*, 12 Ohio St.3d 30, 34, 465 N.E.2d 848 (1984). "While the court of common pleas is required to examine

the evidence, the court of appeals may not weigh the evidence." *Shelly Materials, Inc.* at ¶ 17, citing *Independence* at ¶ 14. Rather, "[t]he appellate court reviews the trial court's decision only on questions of law to determine whether the lower court abused its discretion in finding that the administrative order was supported by reliable, probative, and substantial evidence." *Boice v. Ottawa Hills*, 137 Ohio St.3d 412, 2013-Ohio-4769, 999 N.E.2d 649, ¶ 7, citing *Kisil* at 34. "The fact that the court of appeals * * * might have arrived at a different conclusion than did the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so." *Lorain City Sch. Dist. Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 261, 533 N.E.2d 264 (1988). "[T]he standard of review for courts of appeals in administrative appeals is designed to strongly favor affirmance. It permits reversal only when the common pleas court errs in its application or interpretation of the law or its decision is unsupported by a preponderance of the evidence as a matter of law." *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161, ¶ 30.

### b. Analysis

{¶ 39} Wortham was charged with a violation of Rule 8.2 of the Dayton Police Department Rules of Conduct. Rule 8.2 provides that:

> An officer will be truthful at all times, under oath or not, when conducting official police business. An officer will not knowingly make a false statement to a supervisor; during an investigation, hearing, interview or court proceeding; or when conducting any other official police business. If

an investigation reveals that an officer has made such a false statement, the officer's employment with the Dayton Police Department will be terminated. (Note: This section is not applicable in circumstances when an officer must use misinformation as an investigative tool).

**{¶ 40}** Contrary to Wortham's assertions, the rule provides no requirement that the false statement be related to anything material, substantial, or meaningful. Nor was the City required to eliminate evidence of mistake, lack of information, accident, or other innocent reason to negate the charge of lying by a preponderance of evidence. Notably, Wortham never argued that there was a mistake, lack of information, accident, or other innocent reason to negate the charge of lying. Instead, Wortham adamantly denied ever making the recorded statement and further maintained that he did not speak to Sampson in that manner for him to have ever made the statement. The City was only required to prove by a preponderance of evidence that Wortham knowingly made a false statement "to a supervisor; during an investigation, hearing, interview or court proceeding; or when conducting any other official police business." The trial court found that the City had proven the violation by a preponderance of the evidence, and the record supported its decision.

**{¶ 41}** Both parties stipulated that the MVRs recorded the statement "get your ass down here." Stipulation # 4. The parties do not dispute that, although the MVR provided audio of the statement, there was no visual identification of the speaker of the statement. The critical issue for the court was not to determine what was said in the recording, i.e., the content of the recording, but to determine whether Wortham made the

statement and lied about it.

{¶ 42} The record demonstrates that Officers Fero and Patterson both testified they had personally observed Wortham make a statement along the lines of "get your ass over here." Nov. 11, 2020 Hrg. Tr. 33, 64-65. Officer Fero testified that as he was walking toward Wortham's home, he saw Wortham standing at the front door yelling something into the house that sounded like "get your ass over here." *Id.* at 33, 49. Likewise, Officer Patterson testified that after the officers got out of their police cruisers, they started walking up the walkway to Wortham's house when he observed Wortham at the doorway yelling back into the house "get your ass over here, or something like that." *Id.* at 67. The officers did not observe any other persons or dogs in the area while approaching Wortham's home. *Id.* at 65.

{¶ 43} According to Dawn Manuel, when Wortham was interviewed by PSB, even if he was not on duty at the time, he was participating in his official capacity. *Id.* at 124. Thus, Wortham was required to be truthful at all times during his interview. *Id.* at 125. Wortham testified that he had called upstairs for Sampson to come down, but he denied making the recorded statement. *Id.* at 220. Wortham was asked if it was possible that he made the statement but did not remember making the statement; Wortham was adamant that he never said it. *Id.* at 162. When asked if he had made the statement and had forgotten it, he denied that he would make a statement like that because he would not speak to Sampson in that manner. Wortham also stated that he had listened to the recording and that while he acknowledged the statement was made on the recording, it was not his voice. Ex. 7, p. 122.

**{¶ 44}** Sampson testified that Wortham did not make the statement and stated that Wortham did not talk to her like that. Nov. 11, 2020 Hrg. Tr. 180. Sampson stated that she did not hear the recorded statement made at the moment it was made, but she listened to the recording and could "vaguely hear it" on the recording. *Id.* at 183. Sampson testified that, if she "had to guesstimate," the voice on the MVR sounded like their former next-door neighbor, someone with whom she did not get along. *Id.* She stated that the neighbor used to yell at his dog and kids, and he would leave his dog outside regularly. *Id.* at 183-184. When Sampson came home on February 6, 2019, 20 minutes before the police arrived, she did not see her neighbor or the dog outside. *Id.* at 201.

**{¶ 45}** While Wortham argues on appeal that Sergeant Poe's testimony regarding Burgess's statements that she kept her dog in the garage and that she and Brown did not yell at the dog was hearsay, Wortham never objected to it at any time. "Evidentiary rulings that are not objected to at trial are waived for purposes of appeal unless the appellant demonstrates plain error." (Citation omitted.) *Shields v. Englewood*, 172 Ohio App.3d 620, 2007-Ohio-3165, 876 N.E.2d 972, ¶ 37 (2d Dist.). Nevertheless, there was no need for the trial court to make any determination as to the credibility or admissibility of Burgess's statements to Sergeant Poe. Indeed, the trial court's decision reflects no discussion of Burgess's statements whatsoever. This is because the testimony of the officers, if believed, demonstrated that they had personally observed Wortham make the recorded statement, which contradicted Sampson's "guesstimate" about her neighbor and Wortham's denial of making the statement. In arriving at its decision, the trial court

relied on the "credible testimony of officers Scott Fero and Colin Patterson" to find that Wortham made the recorded statement and lied about it. Decision Affirming the Board's Order on Appeal, (Aug. 9, 2022), at p. 6. Although the officers were unsure if the exact verbiage used was "get your ass down here" or "get your ass over here," the recording reflects, and the parties do not dispute, that the statement made in the recording was "get your ass down here." The slight discrepancy was irrelevant, as the question was not whether the statement was made or what was said, but whether Wortham made it and denied saying it during his PSB interview. The officers were consistent that Wortham made the recorded statement from the time Officer Fero submitted his supplemental police report on February 7, 2019, through their testimony before the Board. Sampson's failure to hear the statement made at the time it was uttered could have been reasonably explained by the fact that she was upstairs getting dressed at the time it was said. Or the trial court could reasonably have found that she was biased and was not a credible witness. Notably, the phrasing of the recorded statement expressed for someone to get "down here," which was consistent with Sampson's being upstairs in the two-story home and Wortham's telling her to come downstairs.

{¶ 46} Based on the evidence in the record, the trial court could have reasonably rejected Sampson's "guesstimate" that the statement could have been made by her neighbor, rejected Wortham's insistence that he did not make the statement, and believed the personal observations of Officers Fero and Patterson in conjunction with the stipulation that the recorded statement was made during the events on February 6, 2019. Accordingly, we cannot say that, as a matter of law, the findings of the common pleas

court were not supported by a preponderance of reliable, probative and substantial evidence or that the trial court abused its discretion in weighing the evidence as it did. Wortham's first assignment of error is overruled.

### III.  Second Assignment of Error

{¶ 47} In Wortham's second assignment of error, he contends that because the Board did not listen to the recording on remand from the trial court, its failure to comply with the court's order requires reversal.   Wortham provides neither legal support for his assertion that the alleged failure requires reversal nor argues that this was an error on the part of the trial court.

{¶ 48} Wortham claims that the trial court ordered the Board to listen to the MVR recording and the Board refused to do so.   Without considering the propriety of the trial court's remand, we conclude that the remand order did not require what Wortham purports.   The first issue the trial court ordered the Board to consider was to "determine whether the contents of the actual recording were properly included in the appeal before the Board."   Order Remanding Case to Civil Service Board (Feb. 14, 2022), at p. 2.   The Board responded that it had not been presented as evidence in the hearing.   Dayton Civil Service Board's Post-Remand Determination (May 4, 2022), at p. 1.

{¶ 49} The second issue the trial court ordered on remand was, "if the recording was not reviewed and considered by the Board, the Board must determine whether its contents or authentication questions alter the Appellee's evidentiary support that is required for the falsification charge."   Order Remanding Case to Civil Service Board (Feb. 14, 2022), at p. 2.   The Board responded that, because the evidence was not

admitted, it had not reviewed or consider the recording. Dayton Civil Service Board's Post-Remand Determination (May 4, 2022), at p. 1. However, the Board also stated that credible witnesses had testified that Wortham made the verbal statement and that was enough to support the Board's decision. *Id.* Likewise, the Board found that the absence of the recording "did not alter the evidentiary support which was the basis for that portion of the falsification charge." *Id.* Thus, contrary to Wortham's contentions, the Board did comply with the trial court's remand orders, and the Board was not required to listen to the recording upon remand as it was never introduced into evidence. Wortham's second assignment of error is overruled.

### IV. Third Assignment of Error

{¶ 50} In his third assignment of error, Wortham asserts that the punishment for a violation of the Rules of Conduct 8.2, under which his employment was terminated, was unreasonable. Wortham further contends that, because Rules of Conduct 4.1 requires that discipline be established according to the degree of severity of the violation, his alleged lying was trivial and did not justify termination.

{¶ 51} In accordance with R.C. 737.13, Chief Biehl adopted written disciplinary rules for sworn personnel of the Dayton Police Department. Dayton Police Department Rules of Conduct Rule 8.2 explicitly states that, "[i]f an investigation reveals that an officer has made such a false statement, the officer's employment with the Dayton Police Department will be underline terminated." (Emphasis sic.) Chief Biehl testified that it was a known policy in the police department that if someone lies, they are dismissed. Wortham testified that he had been aware of that policy.

{¶ 52} Wortham claims that Chief Biehl's testimony regarding the importance of police credibility was "based on a spurious and false interpretation of the United States Supreme Court's decisions in [*Brady*] and [*Giglio*]." Brief of Appellant at p. 21. We disagree. Chief Biehl explained that when an officer is found to have lied, it negatively affects their ability to testify in court and be believed. If an officer were found to be dishonest in an investigation, that information would have to be affirmatively disclosed to defense counsel if the officer were going to testify in a criminal matter, because it is considered exculpatory evidence. According to Chief Biehl, the police department had a burden to provide that information to the county prosecutor and the city prosecutor for any case in which the police officer would potentially testify after a sustained finding of dishonesty.

{¶ 53} Without identifying the disclosure method by name, the release of information Chief Biehl discussed during the hearing is sometimes referred to as a *Brady* list or a *Giglio* list in accordance with the United States Supreme Court cases of the equivalent names: *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* at 87. Evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d

481 (1985).  *Brady* material must be turned over by the government regardless of whether the defense makes a specific request.  *United States v. Agurs*, 427 U.S. 97, 111-12, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).  Moreover, the duty encompasses impeachment evidence as well as exculpatory evidence.  *Bagley* at 676.  The government's duty under *Brady* extends not only to evidence within the possession of the prosecutor, but entails "a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police."  *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).  "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls" under *Brady*.  *Giglio* at 154, quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).  Generally, *Brady/Giglio* lists exist to satisfy the prosecution's obligation to provide criminal defendants with exculpatory or impeachment evidence related to law enforcement witnesses who may testify against the defendant.

{¶ 54} We agree with Wortham that defendants are generally not entitled to disclosure of all testifying officers' personnel records.  *United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir.1992), *abrogated on other grounds in Hampton v. United States*, 191 F.3d 695 (6th Cir.1999).  We further agree that disclosure of officers who have not been found guilty or who have been acquitted of allegations of lying or otherwise dishonest conduct are also not to be disclosed to defense counsel under the guise of *Brady* or *Giglio*. *Fraternal Ord. of Police Lodge No. 5 by McNesby v. City of Philadelphia*, 267 A.3d 531 (Pa.Commw.2021).  But where an officer has been found guilty of lying or otherwise

untruthful behavior, that information may potentially be used for impeachment purposes as it goes to the credibility of the officer. The credibility of a witness may be attacked on cross-examination regarding specific instances of conduct if, in the discretion of the court, it is clearly probative of truthfulness or untruthfulness and concerns the witness's character for truthfulness or untruthfulness. Evid.R. 608(B). Nevertheless, "while the *Brady* rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir.1988). Whether or not the prosecution would be required to disclose an officer's finding of dishonesty is dependent on the individual facts of each case. But because the prosecution is responsible for knowing information also known to the police for *Brady* purposes, it is not unreasonable for the police to provide the *Brady/Giglio* list in order for the prosecutors to make an informed decision.

{¶ 55} In this case, if Wortham were found to have lied, according to Chief Biehl, Wortham's name would have been provided to the city and county prosecutor's offices to be used in determining whether Wortham's information was subject to disclosure to defense counsel in any case in which Wortham might testify. Any limitation on Wortham's ability to testify at trial would negatively affect his ability to act as a police officer. For that reason, the department had the blanket rule that, if an officer were found guilty of committing a violation of Rule of Conduct 8.2, then the employee would be terminated. We cannot find that it is unreasonable for the police department to terminate

the employment of an officer who has been found guilty of lying, as the ability of that officer to testify and perform some of essential duties is hampered by such a finding of guilt. The Ohio Supreme Court has acknowledged the public policy " 'that police officers are held to a higher standard of conduct than the general public.' " (Citations omitted.) *Jones v. Franklin Cty. Sheriff*, 52 Ohio St.3d 40, 43, 555 N.E.2d 940 (1990). "Dishonesty by a police officer is particularly contemptible conduct. The lives and the liberty of the criminal accused daily lie in the balance in America's courtrooms. Fair trials depend on the integrity of the police. The public justifiably rely on the honesty of its police. If the public came to believe its police cannot be relied upon to give forthright and honest testimony, law enforcement will suffer a grievous blow." *Myles v. City of Dayton,* 2d Dist. Montgomery No. 10401, 1987 WL 29451, *6 (Dec. 14, 1987). Consequently, we cannot conclude that the punishment of termination of employment of a police officer for violating Rule 8.2 is unlawful, arbitrary, unreasonable, or unconstitutional.

{¶ 56} Wortham further contends that even if he did lie, it was so trivial that the severity of the punishment did not fit his actions. He relies on Rule of Conduct 4.1, which provides that an "officer will be disciplined according to the degree of severity of the violation, and the effect it has upon the discipline, good order, and best interest of the Department." According to Wortham, because his trivial lie was not severe, he should not have been terminated. Yet, if an officer is found guilty of lying, regardless of the triviality of the lie, and he or she is placed on a *Brady/Giglio* list, it detrimentally affects the ability of the officer to testify in court, which officers are required to do as part of their jobs on a regular basis. Any violation of Rule 8.2 is severe, which is why it could

reasonably be viewed as requiring termination.

{¶ 57} "This court does not sit as a super personnel department, and the Dayton Civil Service Board must be given a fair degree of latitude when punishing misconduct. Indeed, we have recognized that 'Civil Service Boards must have the flexibility to discipline [employees] involved in incidents * * * without being second-guessed by the courts merely on the basis of past examples of disciplinary action which may, at first glance, seem inconsistent.' " *In re Civ. Serv. Charges against Merker*, 2d Dist. Montgomery No. 20098, 2004-Ohio-2045, ¶ 12, quoting *In the Matter of Civ. Serv. Charges & Specifications Against Norton*, 2d Dist. Montgomery No. 13557, 1993 WL 240087 (June 29, 1993). Even if we were of the view that termination was a harsh penalty for what Wortham was found to have done, we could not substitute our judgment for that of the Civil Service Board regarding the proper disciplinary sanction. *In the Matter of Davis*, 2d Dist. Montgomery No. 14066, 1994 WL 461771, *6 (Aug. 24, 1994). As in the case herein, "[w]e are loathe to substitute our judgment of the appropriate discipline for that of the Director of Police." *Myles* at *9. We cannot say that the trial court erred in upholding the Board's determination that Wortham should be discharged for his actions. Wortham's third assignment of error is overruled.

## V. Fourth Assignment of Error

{¶ 58} In his final assignment of error, Wortham raises two distinct issues. First, Wortham alleges that the rules of conduct that require termination of employment create a conclusive presumption that violates due process of law. Second, he argues that the City failed to prove that Wortham's exercise of his First Amendment rights had no effect

on the decision to terminate his employment.   Both of these arguments lack merit.

{¶ 59} Wortham first asserts that a violation of Rule 8.2 must have additional penalties available that correlate to the degree of seriousness of the violation of the rule, i.e., there must be a sliding scale rather than a single punishment for any violation of the rule.   According to Wortham, to have but one punishment for any violation creates a "conclusive presumption" for the correct punishment and violates due process.

{¶ 60} "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' "   *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).   "Due process of law implies, in its most comprehensive sense, the right of the person affected thereby to be present before the tribunal which pronounces judgment upon a question of life, liberty or property, to be heard, by testimony or otherwise, and to have the right of controverting, by proof, every material fact which bears on the question of right in the matter involved.   If any question of fact or liability be conclusively presumed against him, such is not due process of law." *Williams v. Dollison*, 62 Ohio St.2d 297, 299, 405 N.E.2d 714 (1980).

{¶ 61} The Dayton Police Department Rules of Conduct do not create such a conclusive presumption.   As can be seen in this case, Wortham was entitled to the full panoply of due process rights in his administrative proceedings.   Throughout the entire process, Wortham was granted the opportunity to be represented by counsel, to have notice of all his hearings, to be advised of the charges and evidence against him, to present evidence and witnesses on his behalf, and to appeal all of the decisions to a

reviewing body. Wortham had the opportunity to challenge every material fact alleged by the City. The fact that he was found guilty of violating the rules of conduct, a finding that necessitated his termination, does not mean that he was not provided due process. Furthermore, Rule of Conduct 8.2 explicitly states that any violation results in termination of employment, such that Wortham was on notice and aware of the consequences of violating that Rule. Wortham's due process claim fails.

**{¶ 62}** Wortham further claims that his "prior exercise of his First Amendment Rights or use of the Civil Rights process in prior matters cannot be utilized as grounds or motive for discipline or penalizing [Wortham]." Brief of Appellant at p. 24. Wortham contends that the police department retaliated against him and used the allegation that he lied during his PSB interview as a pretext for his termination. According to Wortham, because he had made complaints against the Dayton Police Department, the City was required to show that his First Amendment rights had no effect on the decision to terminate his employment.

**{¶ 63}** In support of his argument, Wortham relies on *Mt. Healthy City School District Bd. of Edn. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ("*Mt. Healthy*"). In *Mt. Healthy*, Doyle, an untenured teacher, sued the Mt. Healthy City School District Board of Education, alleging that the Board's refusal to renew his teaching contract violated his rights under the First and Fourteenth Amendments to the United States Constitution. *Id.* at 276. Doyle had worked as a teacher and was involved in several controversial incidents during his final year, culminating with an incident wherein Doyle called in to a local radio station discussing a school memorandum. *Id.* at 281-282.

Approximately a month after the radio incident, the superintendent recommended the school board not re-hire Doyle. In response to a request for a statement of reasons for the Board's actions, Doyle received a statement citing multiple reasons, including a reference to the radio station incident. *Id.* at 282-283.

{¶ 64} The district court found that Doyle's exercise of his First Amendment rights by calling into the radio station had played a "substantial part" in the board's decision not to renew his contract and concluded that Doyle should be reinstated. At the same time, however, the court found that other reasons not to renew the contract existed, independent of Doyle's exercise of constitutional rights. *Id.* at 284-285.

{¶ 65} The Supreme Court held that, even if the protected conduct had played a substantial part in the board's decision not to renew, if the board would have reached the same decision even without Doyles' First Amendment activity, then the board's decision would not amount to a constitutional violation justifying remedial action. *Id.* at 285-287. The Supreme Court established a "but for" test setting forth that the plaintiff-employee has the initial burden of showing that his constitutionally-protected conduct was a motivating factor in the employer's decision not to rehire him. If the plaintiff-employee meets that burden, then the burden shifts, and the defendant employer must prove by a preponderance of the evidence that it would have reached the same decision in the absence of the protected conduct. *Id.* at 287.

{¶ 66} Wortham alleges that he filed "several civil complaints" and "often exercised his First Amendment rights" such that the allegation that he lied during his May 1, 2019 PSB interview was a pretext for his termination. However, Wortham was not fired for

exercising his First Amendment rights. In order to establish a violation of free speech in accordance with *Mt. Healthy*, Wortham would have had the initial burden to substantiate that the conduct for which he was fired was constitutionally-protected conduct. The only basis for Wortham's termination was Wortham's lying during his May 1, 2019 PSB interview, and we see no violation of his First Amendment rights during that interview. Because no protected conduct played a role in the Board's decision to terminate Wortham's employment, *Mt. Healthy* does not apply. Accordingly, we overrule his fourth assignment of error.

## VI. Conclusion

**{¶ 67}** Having overruled all of the assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and EPLEY, J., concur.