[Cite as *State v. Mathews*, 2025-Ohio-195.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-2 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 010 |
| | : | |
| JOSIAH MATHEWS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 24, 2025

. . . . . . . . . . .

JEFFREY R. MCQUISTON, Attorney for Appellant

ANDREA K. BOYD, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Defendant-Appellant Josiah Mathews appeals from a judgment of the Champaign County Court of Common Pleas, which denied his post-conviction motion for a new trial. For the reasons that follow, the judgment of the trial court will be affirmed.

**I. Facts and Procedural History**

{¶ 2} On October 24, 2011, Mathews entered the Urbana home of 87-year-old Louis Taylor and brutally attacked him with a weapon – likely brass knuckles – causing blunt force injuries to his head, face, and mouth. After the attack, Mathews stole several items, including Taylor's Jeep Liberty and wedding ring. Matthews fled the scene and left Taylor for dead.

{¶ 3} The next day, when Taylor did not show up for his morning coffee at Tim Horton's, his friend Henry Baldwin went to Taylor's home to check on him. When Baldwin pulled into the driveway, he noticed that the garage door was wide open and that the door from the garage into the house was ajar. He then went into the house, which seemed to be empty.  As he walked past a bathroom, he noticed some blood on the floor and the sink. Baldwin testified that, when he continued into the living room, "there was blood all over the couch, you know, where it had been, looked like he had been sitting there[.]" Trial Tr. at 407. Photographs of the crime scene showed the couch soaked with blood in multiple locations. Exhibit 1. Baldwin testified that, at that time, he did not go any further into the house and left to take his wife to work.

{¶ 4} After dropping off his wife, Baldwin went back to Taylor's house. He told the jury that, this time, he entered through the side door of the garage and made his way to the bedroom, where he found Taylor lying in bed, covered in blood. Baldwin could not talk to Taylor "[b]ecause he was just mumbling or moaning, you know, breathing was real shallow." Trial Tr. at 411. Baldwin then called 911. First responders arrived soon after and found Taylor mostly confused and unresponsive. Photographs showed open wounds on the top and side of his head, dried blood all over his head, face, and neck, and a severely

bruised and swollen right eye. Exhibit 5. Taylor was stabilized as much as possible and then taken by Care Flight to the hospital. Several weeks later, he succumbed to his injuries at a hospice facility.

{¶ 5} After the incident, Mathews left Urbana and went to his friend/drug dealer Anthony Howard's house in Springfield. Howard testified that when Mathews arrived, he had been "excited," showed him his hands, and reported that he had just "beat the fuck out of somebody" and thought he had killed the victim. Howard Depo. at 17, 47. Howard explained that Mathews's hands looked like he had just gotten into a fight.

{¶ 6} Howard also testified that Mathews had wanted to get rid of the vehicle in which Mathews had arrived. "[T]he vehicle that he wanted to get rid of was hot, as we say. It was bad business. It was stolen. . . and I suggested to him to get rid of it if it was associated with that situation." Howard Depo at 20. Howard suggested that it would be in Mathews's best interest to clean up vehicle – remove any fingerprints – and get rid of it, rather than sell it. Howard then provided Mathews with cleaning supplies.

{¶ 7} Howard's house was not the only place Mathews stopped at after the incident. Amanda Lewis, who lived a short distance from Taylor's home, testified that Mathews had been there on the night of October 24, 2011. Trial Tr. at 526-527, 1319-1320. Police located a bloody towel in Lewis's bathroom and Mathews's clothing on top of her vehicle.

{¶ 8} Other evidence also linked Mathews to Taylor's murder. For instance, the stolen Jeep Liberty, which had Mathews's fingerprints on it, was recovered at the Long John Silver's on South Limestone Street in Springfield, which was right next door to the

Super 8 Motel that Mathews checked into at 11:51 p.m. and stayed at on the night of the murder. Trial Tr. at 582-586, 593-602, 617, 663. There was also evidence linking Mathews to Taylor's stolen wedding ring. Shawn Langford, a friend of Mathews, testified that Mathews had asked him to pawn a wedding ring the day after the murder. Trial Tr. at 676-677, 789-794, 1347.

{¶ 9} Langford also noted that, before the murder, Mathews had told him that there was a "lick he wanted to hit" (a robbery he wanted to do) in Urbana near Melvin Miller Park, that it had to be done at night, and that he knew the person because he had done odd jobs for him. Trial Tr. at 800-803, 824. Taylor lived near the park and Mathews had previously done work for him. Langford further stated that he knew Mathews to own brass knuckles, the suspected murder weapon in this case. Trial Tr. at 836.

{¶ 10} Cell phone evidence also implicated Mathews. Phone records showed that Mathews's phone was turned off from 7:43 p.m. until 10:50 p.m. on the night of October 24, and cell tower data placed him in the Urbana area in the hours before his phone was turned off. When it was turned back on, the data indicated that Mathews had traveled to Springfield. Evidence also indicated that Mathews had deleted his text messages from October 16-26, 2011.

{¶ 11} Six days after the incident, Mathews was arrested on unrelated charges. Mitzi Davis, a nurse at the jail, told the jury that when he was booked into the jail, Mathews had dime-sized, scabbed-over abrasions on his hand and his right hand was swollen. Trial Tr. at 634; Exhibit 8. The jail's booking officer, Anthony Lyons, also noted that Mathews had scrapes on both hands.

{¶ 12} In addition to noting Mathews's physical condition when he entered the jail on October 30, law enforcement officers collected the personal property he had with him. Deputies confiscated an LG cell phone, a multi-colored wallet, Mathews's identification, black string, and multiple rubber gloves. Trial Tr. at 1311; Exhibit 29.

{¶ 13} A decade after the murder, Mathews was indicted on charges related to Taylor's death, including: Count One, aggravated murder; Counts Two, Three, and Four, murder; Count Five, aggravated robbery; Count Six, robbery; Count Seven, felonious assault; Count Eight, grand theft of a motor vehicle; and Count Nine, tampering with evidence.

{¶ 14} Before the trial, the parties stipulated and agreed to the admissibility and authenticity of 23 exhibits, including, as pertinent to this appeal, Exhibit 9, "Booking Assessment and Medical Records-Josiah Mathews October 30, 2011." Stipulated Exhibits Filing Jan. 7, 2022. Included in Exhibit 9, among other things, was the booking form from the jail which listed items collected from Mathews when he was admitted into the facility; however, gloves were not included on that form. The exhibit also included notes from Lt. Josh Jacobs which stated: "Anthony Lyons – J.M. has scrapes on both hands 'they don't look like they are fresh.' " The trial court admitted this evidence on the first day of trial.

{¶ 15} After a lengthy trial which began on October 11, 2022, a jury found Mathews not guilty of aggravated murder and murder in Count Two, but guilty of two counts of murder (Counts Three and Four), aggravated robbery, robbery, felonious assault, theft of a motor vehicle, and tampering with evidence. He was sentenced to an aggregate term

of 25 years to life in prison.

{¶ 16} Mathews did not file a direct appeal, but on January 10, 2023, after a corrections officer privately reached out to defense counsel, Mathews filed a motion for a new trial, citing newly discovered evidence. He contended that a property inventory form, which contained a list of items found on his person when he was booked into jail on October 30, 2011, had not been discovered until after the trial. According to Mathews, there was a discrepancy between evidence that was presented at trial – a property form that included latex gloves – and information he received after trial from the corrections officer – that there was a form that did not have gloves listed. He claimed that he had been unaware of the form that did not mention the gloves until the officer told him about it after the trial.

{¶ 17} After nearly a year of hearings and extensive briefing on the matter, the trial court overruled Mathews's motion for a new trial. This appeal followed.

**II. Motion for a new trial**

{¶ 18} In his first assignment of error, Mathews asserts that the trial court erred in denying his motion for a new trial "in spite of clear evidence that the State failed to disclose evidence . . . which constituted a *Brady* violation." Appellant's Brief at 4.

<u>New trial based on Crim.R. 33(A)(6)</u>

{¶ 19} To warrant the granting of a new trial based on newly discovered evidence under Crim.R. 33(A)(6), it must be demonstrated that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted; (2) has been discovered since the original trial; (3) could not in the exercise of due diligence have been

discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence. *State v. Petro*, 148 Ohio St. 505 (1947), syllabus; *State v. Hatton*, 2022-Ohio-3991, ¶ 32. Generally, the decision whether to grant a new trial is within the discretion of the trial court, *State v. Johnson*, 2023-Ohio-1686, ¶ 23 (2d Dist.), but when the ruling is based on alleged *Brady* violations, we review de novo because the inquiry is whether due process was violated. *State v. Smith*, 2018-Ohio-4691, ¶ 24-25 (2d Dist.).

New trial based on *Brady* violations

{¶ 20} "Due process requires that the prosecution provide defendants with any evidence that is favorable to them whenever that evidence is material either to their guilt or punishment." *State v. Brown*, 2007-Ohio-4837, ¶ 39, citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is material under *Brady* only if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Johnston*, 39 Ohio St.3d 48 (1988), paragraph five of the syllabus.

{¶ 21} When determining materiality, the question is not whether the defendant would more likely than not have received a different verdict with the questioned evidence, but "whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Brown* at ¶ 40, quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *State v. Bethel*, 2022-Ohio-783, ¶ 19. It does not mean, however, that the disclosure would have led to an acquittal. *U.S. v. Agurs*, 427 U.S. 97, 111 (1976).

{¶ 22} *Brady* material must be turned over regardless of whether the defense

makes the specific request. *Id.* at 111-112; *Wortham v. Dayton*, 2023-Ohio-1767, ¶ 53 (2d Dist.). The State's duty under *Brady* extends not only to evidence within the possession of the prosecutor but entails "a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles at* 437.

{¶ 23} A *Brady* violation has three elements: (1) the State suppressed evidence, either willfully or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or because it was impeaching; and (3) the suppressed evidence was material. *See Bethel* at ¶ 19; *Moore v. Illinois,* 408 U.S. 786, 794-795 (1972); *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

{¶ 24} Mathews makes several *Brady*-related arguments as to why he should be granted a new trial. First, he contends a conversation that then-booking officer Lyons had with the Attorney General's office in 2021 was problematic under *Brady*. In this interaction, Officer Lyons purportedly informed the State before the trial that when he encountered Mathews at the jail on October 30, 2011, Matthews had several items on his person, but *not* gloves. Testimony from the September 2023 hearing is illustrative.

> **Attorney:** Did you make it clear to the Attorney General's Office that you did not observe Josiah Mathews with latex rubber gloves the day you booked him into the Tri-County Jail?
>
> **Officer Lyons:** Correct. I remember specifically thinking to myself, like, If I logged that this guy had a piece of string in his pocket, why would I not log in a pair of gloves?

Sept. 8, 2023 Hearing Tr. at 22.

{¶ 25} Although both sides agree that the *conversation* between Officer Lyons and the Attorney General's office was not relayed to Mathews's defense counsel before the trial, the *content* from the conversation – that Officer Lyons had not found gloves on Mathews – was known by defense counsel well before trial. This is evinced by Stipulated Exhibit 9: "Booking Assessments and Medical Records – Josiah Mathews October 30, 2011." Page 14 of Exhibit 9 was the "Initial Property Form," a document showing all of Mathews's items removed by Officer Lyons when he was booked into jail on October 30, 2011. Gloves were not mentioned. The document itself was signed by Officer Lyons and Mathews, and its admissibility and authenticity were stipulated by both the State and the defense. The *call* between Officer Lyons and the State (assistant attorney general) was not evidence, but the *content* was, and Mathews knew about that well before trial. Further, the content was not beneficial to Mathews. It is hard to imagine that whether Mathews was or was not found with gloves (there was conflicting evidence) when he was booked *for a different crime six days **after*** the murder could have played any significant role in the case. There was no *Brady* violation.

{¶ 26} Mathews also argues that it was a *Brady* violation for the State not to disclose Officer Lyons as a witness; however, the State was under no obligation to list individuals it did not intend to call as witnesses. *See* Crim.R. 16(I) ("Each party shall provide to opposing counsel a written list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal."); *State v. Craft*, 2002-Ohio-4481, ¶ 13-14 (12th Dist.) (a trial court abuses its

discretion when it orders the State to disclose names of witnesses it does not intend to call to testify). Further, because Officer Lyons was known to Mathews before trial – his name appeared at least four times in Stipulated Exhibit 9 – not including him on the witness list could not have been the basis for a new trial based on newly discovered evidence.

{¶ 27} Mathews also contends that the State ran afoul of *Brady* when it failed to give him the opportunity to inspect "tangible objects" like gloves, especially when it intended to introduce them at trial. Because of this alleged violation, it is his position that he first became aware of the rubber gloves at trial. The record, however, points in a different direction.

{¶ 28} According to the State's May 12, 2023 Hearing Exhibits 2 and 3, on February 26, 2021, Mathews was provided with supplemental discovery, including the Urbana Police Department property form that listed the gloves. The property form inventoried all the items collected and stated: "EVH Plastic Inmate Personal Property Bag Containing an LG Cell Phone, Multi-Colored Wallet, Josiah Mathews ID, Black String, and Multiple Rubber Gloves[.]" UPD Property Form, Page 5, Item 56. Based on that, Mathews cannot credibly claim he was unaware that the gloves existed until trial.

{¶ 29} As to whether the State denied Mathews the opportunity to inspect the "tangible objects," the record also belies that assertion. In early January 2022, defense counsel met with Lt. Jacobs to look at specific pieces of evidence, including the victim's clothing and a bloody rag found in the home. State's Exhibit 5; May 12, 2023 Hearing Tr. at 48-49. According to Lt. Jacobs's testimony and an audio recording of the event (May

12, 2023 Hearing Exhibit 11), during that meeting Lt. Jacobs provided the requested items but also showed defense counsel the Urbana police department property form, which had previously been provided during discovery, which included Item 56, "multiple rubber gloves." Despite being made aware (again) of the existence of the gloves, defense counsel did not ask to see any items other than the requested clothing, shoes, and a rag. Mathews was not denied the opportunity to inspect "tangible items" like gloves.

{¶ 30} Even if we came to the opposite conclusion on all the *Brady* and Crim.R. 33 related topics, we would still conclude that the trial court did not err in denying a new trial because the trial resulted in a verdict worthy of confidence.

{¶ 31} There was strong evidence presented at trial that Mathews was guilty of Taylor's murder. Before the crime, Mathews told a friend that he was going to "hit a lick" at a house close to Melvin Miller Park in Urbana, that it had to be done at night, and that the victim was someone for whom he had worked in the past. Taylor lived near the park, and Mathews had done odd jobs for him previously.

{¶ 32} Cell phone location data put Mathews near the victim's house in the timeframe of the incident on October 24, 2011, and evidence revealed that he turned the phone off for approximately three hours that night. Further, there was evidence that Mathews deleted all his text messages from October 16 to October 26, 2011.

{¶ 33} After the murder, Mathews went to Amanda Lewis's house (which was within walking distance of Taylor's home), where police later found bloody towels in the bathroom and Mathews's clothing on top of the trunk of her vehicle. That same night, Matthews went to see Anthony Howard; he told Howard that he had "beat the fuck out of

somebody" and revealed that he thought he had killed the victim. Howard noticed that Mathews's hands looked like he had been in a fight, and Mathews was known to have brass knuckles.

{¶ 34} Mathews also informed Howard that he had stolen Taylor's Jeep, and Howard suggested that Mathews clean up any fingerprints that might be found. Mathews asked others if they knew anyone who wanted to buy a Jeep. Trial evidence also revealed that, on the night of the murder, Mathews stayed at a hotel in Springfield; the Jeep was found in an adjacent parking lot the next day. His fingerprints were on the rear bumper.

{¶ 35} Taylor's wedding ring was stolen during the crime. Mathews asked another friend to pawn a wedding ring the day after the murder.

{¶ 36} Mathews was arrested on unrelated charges on October 30, 2011, six days after the incident at Taylor's home. All the jail personnel who came in contact with him that day noted that he had wounds on his hands and knuckles, and testimony revealed that those injuries had been consistent with striking someone with his fists or with brass knuckles.

{¶ 37} Mathews's injuries were also consistent with what would have caused Taylor's injuries and death. When first responders arrived on the morning of October 25, 2011, Taylor had large open wounds on the top and side of his head and dried blood on his head, face, and neck. He also had a severely bruised and swollen right eye. After his death, an autopsy revealed multiple skull fractures and brain bleeds, and the photographs showed cuts and bruises all over Taylor's head, face, and neck. The autopsy's conclusion was that Taylor's death was caused by blunt force trauma to the head with a blunt object.

**{¶ 38}** Based on all of that, the evidence against Mathews, even without any mention of gloves, was enough to be confident in a guilty verdict. Accordingly, we conclude that the trial court did not err by denying Mathews's motion for a new trial; he failed to meet the requirements under both Crim.R. 33(A)(6) and *Brady*. Mathews's assignment of error is overruled.

### III.    Conclusion

**{¶ 39}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

LEWIS, J. and HUFFMAN, J., concur.